IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMANDA SUE HUTTON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 10-211 Erie |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., District Judge.

## I. INTRODUCTION

Amanda Sue Hutton ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401, *et seq.* and § 1381 *et seq.* Plaintiff filed her applications on June 11, 2007, alleging disability since October 31, 2001 due to hypertension, depression and obesity (AR 122-145; 168 ).[1] Her applications were denied, and she requested an administrative hearing before an administrative law judge ("ALJ") (AR 86-88; 104). Following a hearing held on May 28, 2009 (AR 58-85), the ALJ concluded, in a written decision dated June 15, 2009, that Plaintiff was not entitled to a period of disability, DIB or SSI under the Act (AR 11-23). Plaintiff's request for review by the Appeals Council was denied (AR 1-4), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are the parties' cross-motions for summary judgment. For the reasons

---

[1] References to the administrative record [ECF No. 4], will be designated by the citation "(AR ___)".

1

that follow, the Commissioner's motion will be denied and the Plaintiff's motion will be granted only to the extent she seeks a remand for further consideration.

## II. BACKGROUND

Plaintiff was 24 years old on the date of the ALJ's decision, has a high school education and past relevant work experience as an assembler and cashier (AR 21; 169; 172). Plaintiff claims disability on the basis of both her physical and mental impairments.

### *Physical Impairments*

Plaintiff was treated by Renato Ramirez, M.D., her primary care physician, for hypertension, obesity and complaints of edema (AR 227-234; 273-285). Treatment notes from July 2004 through June 2007 revealed that Plaintiff complained at times of back pain and leg swelling, but her physical examinations were generally unremarkable, except obesity was noted (AR 231-232; 273-274; 276-277; 279). In May 2007, Dr. Ramirez noted some swelling in her lower legs, but no swelling was noted in her physical examinations in September and October 2007 (AR 276-277; 279). Plaintiff had negative straight-leg raising, good reflexes, and no difficulty with walking (AR 227; 229; 231-234; 274-277).

Dr. Ramirez also treated Plaintiff for hypertension, and the medical record reflects blood pressure readings of 136/96 on March 30, 2005, 128/84 on May 13, 2005, 130/84 on June 6, 2005 and 128/72 on June 26, 2007 (AR 183; 271; 276). On June 21, 2007, Dr. Ramirez reported that Plaintiff felt better on her blood pressure medication (AR 227).

Plaintiff also suffered from obesity and was "strongly" advised to lose weight through diet and exercise (AR 227; 234; 278). In January 2009, Plaintiff's weight was recorded at 237 pounds (AR 273). Plaintiff reported that despite her weight loss efforts she continued to gain weight and requested a referral for bariatric surgery (AR 273). On March 5, 2009, Etwar McBean, M.D., stated that based upon Plaintiff's current weight of 242 pounds and a BMI of 42.9, she would benefit from bariatric surgery (AR 398).

On October 25, 2007, Charles Wansor, a state agency adjudicator, reviewed the medical evidence of record and concluded that Plaintiff had no physical exertional or non-exertional limitations (AR 266-272).

2

*Mental Impairments*

Plaintiff has a history of residential and outpatient psychiatric treatment, medication and counseling (AR 286-395; 345-395). She was placed in various foster care institutions and group homes as a teenager (AR 286-344). Plaintiff exhibited behavior problems, such as running away, truancy, oppositional behavior and underage drinking (AR 286-287; 326-329). A psychiatric evaluation dated February 17, 2000 noted that Plaintiff had a history of suicidal ideations and reported symptoms of depression (AR 326-328).

On December 12, 2001, Mary Anne Albaugh, M.D., a child psychiatrist, completed a discharge summary with respect to Plaintiff's placement in the Sarah Reed Foster Family Based Treatment Program (AR 390-395). Dr. Albaugh reported Plaintiff's shelter placement history, noting that she was removed from her home in March 1997 after alleging sexual abuse by her stepfather (AR 390). Dr. Albaugh reported that in August 2000 Plaintiff presented with significant symptoms of depression, including "low mood," sleep disturbances, poor concentration, decreased energy and suicidal ideations (AR 390-391). She noted however, that Plaintiff responded "very well" to antidepressant treatment and her mood and sleep stabilized (AR 391). Plaintiff also participated in individual therapy which had been helpful (AR 392-393). Plaintiff's medications were discontinued in March 2001 at her request (AR 392). Dr. Albaugh reported that Plaintiff continued to function well and her concentration remained on track (AR 392). She was very successful in school and actively participated in the work study program (AR 392-393). Plaintiff was able to maintain her job at a Sheetz Car Stop, and was a "good worker" (AR 392). Dr. Albaugh started Plaintiff on a trial of Zoloft in September 2001for her complaints of a depressed mood and fatigue (AR 393). It was noted that Plaintiff married and she was subsequently discharged from the Sarah Reed program on October 29, 2001 (AR 394). Dr. Albaugh diagnosed Plaintiff with major depression recurrent, with recent recurrent depressive symptoms, post-traumatic stress disorder and oppositional defiant disorder by history

3

(AR 394). She assigned her a global assessment of functioning[2] ("GAF") score of 60 to 62 (AR 394).

Approximately four years later, Plaintiff was seen by Dr. Ramirez on May 13, 2005 and complained of depression post pregnancy (AR 229). She stated that she had been treated with Prozac and was subsequently prescribed Zoloft, but it caused anger, irritability, and migraine type headaches (AR 229). Plaintiff requested an antidepressant and Dr. Ramirez advised her that Topamax would treat her migraine headaches and her depression (AR 229). Dr. Ramirez noted that Plaintiff was tearful on examination, and he recommended family counseling (AR 229).

On August 5, 2005, Gerard Francis, M.D., performed an initial psychiatric evaluation (AR 236-237). Plaintiff stated that she had been married for four years and had two boys, ages one and two (AR 236). She reported a past history of depression, bipolar disorder and post-traumatic stress disorder ("PTSD") (AR 236). Dr. Francis noted Plaintiff's "very chaotic past" after being sexually and physically abused by her stepfather, and noted her placement in various foster care institutions up until 2001 (AR 236). Plaintiff stated that she had been doing "well" since getting married in 2001, but had noted increasing mood swings, irritability, agitation, and "flying off the handle easily" (AR 236). Plaintiff denied suicidal ideations at the time of the evaluation, as well as the past few years prior to the evaluation (AR 236).

---

[2] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 61 to 70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning" but is "generally functioning pretty well;" of 51 to 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41 to 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31 to 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 21 to 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; and of 11 to 20 may have "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

On mental status examination, Dr. Francis reported that Plaintiff was overweight and appeared anxious (Ar 237). She exhibited "fairly good eye contact" and her speech was normal, with the exception of being of low tone and rate (AR 237). Dr. Francis found her thoughts were organized and goal directed, and her insight and judgment were fair (AR 237). Plaintiff's attention, concentration and intelligence were all reported within normal limits (AR 237). Dr. Francis diagnosed Plaintiff with bipolar disorder, mixed, and PTSD, prolonged (AR 237). He assigned her a GAF score of 55-60 and prescribed Depakote (AR 237).

Plaintiff returned to Dr. Francis on September 15, 2005 and reported that she stopped taking her medication because she thought she was pregnant (AR 238). She noted, however, that the Depakote had helped her "significantly" in that she was less "snappy," her mood was stable and she denied any suicidal thoughts (AR 238). Dr. Francis reported that Plaintiff was pleasant, cooperative, well-mannered and made good eye contact (AR 238). Her speech was clear and precise, and her thoughts were organized and goal directed (AR 238). Dr. Francis observed that she was casually dressed and fairly well groomed (AR 238). Plaintiff denied any suicidal thoughts, and requested a prescription for Depakote to be filled only if she was not pregnant (AR 238). Dr. Francis diagnosed her with bipolar disorder and PTSD, prolonged (AR 238). He assigned her a GAF score of 55-60, and directed her not to take any medications until her pregnancy status was verified (AR 238).

On October 3, 2007, Julie Uran, Ph.D., performed a clinical psychological disability evaluation of Plaintiff (AR 239-244). Plaintiff stated that she had been married for six years and had two sons, ages three and four (AR 239). Plaintiff reported that she had a daughter that died in 2006 after living for four hours following her birth (AR 239). Plaintiff stated that she was last employed in 2002, and would likely have difficulty sustaining employment due to problems with bending, as well as uncontrolled blood pressure and associated dizziness (AR 239). She claimed she suffered from headaches several times per week (AR 239).

Plaintiff stated that her depressive episodes occurred more frequently, and included overwhelming feelings of sadness, loss of interest in all activities, significant eating and sleeping disturbances, and agitation (AR 240). She claimed she could not sleep for more than one and

5

one half hours per night (AR 240). Plaintiff reported fatigue, feelings of worthlessness or inappropriate guilt and impaired concentration (AR 240). She claimed she sometimes experienced suicidal thoughts, and had made three prior attempts, with the most recent attempt occurring in 1999 (AR 240). She stated that she had received mental health counseling and medications in the past, and although she was currently prescribed Zoloft and Cymbalta by her primary care physician, she did not take these medications (AR 240).

On mental status examination, Dr. Uran reported that Plaintiff was fully alert and oriented, and no abnormal body movement was observed (AR 241). Plaintiff was cooperative, her speech was coherent and spontaneous, her mood and affect were situationally appropriate, her thought processes were normal, and there was no evidence of perceptual disturbance (AR 241). Dr. Uran noted that there was evidence of excessive rumination regarding her daughter's death, and that the Plaintiff appeared guarded or suspicious of others (AR 241). She further concluded that the Plaintiff's memory was intact and her social judgment was appropriate for her age, mental abilities and experiences (AR 242). Dr. Uran found Plaintiff was of average intelligence (AR 241). Plaintiff evidenced difficulties with impulse control as marked by displays of anger, and her capacity to gain insight was limited (AR 242). Dr. Uran reported that Plaintiff was motivated and interested in mental health treatment (AR 242). She diagnosed Plaintiff with major depression, recurrent, PTSD; primary insomnia; anxiety disorder, not otherwise specified; and alcohol dependence, in remission (AR 242). Dr. Uran assessed Plaintiff with a GAF rating of 55 (AR 242). She stated that Plaintiff's prognosis would be deemed fair in terms of higher level functioning and "personality integration" (AR 242).

Dr. Uran opined that Plaintiff was not limited in her ability to understand, remember and carry out short, simple instructions (AR 245). She noted that Plaintiff was moderately limited in understanding, remembering and carrying out detailed instructions, and in her ability to make simple work-related judgments (AR 245). Dr. Uran further opined that Plaintiff was moderately limited in her ability to interact appropriately with the public, supervisors and co-workers; respond appropriately to work pressures in the usual work setting; and respond appropriately to changes in a routine work setting (AR 245).

Plaintiff returned to Dr. Ramirez on October 9, 2007, and reported feeling depressed and anxious with sleep difficulties (AR 276). She requested a prescription for an antidepressant and stated that she wanted to begin counseling as soon as possible (AR 276). Dr. Ramirez assessed her with, *inter alia*, anxiety, depression and insomnia, and prescribed Cymbalta (AR 276).

On October 24, 2007, Jan Melcher, Ph.D., a state agency reviewing psychologist, reviewed the medical evidence of record and found that Plaintiff's mental impairments did not meet or equal the requirements of Listings 12.04 (Affective Disorders), 12.06 (Anxiety Related Disorders) and 12.09 (Substance Addiction Disorders) (AR 252-265). She concluded that these impairments resulted in only mild restrictions in Plaintiff's activities of daily living, and only moderate difficulties in maintaining social functioning, concentration, persistence and pace (AR 262).

Dr. Melcher also completed a Mental Residual Functional Capacity Assessment Form (AR 248-250). She opined that Plaintiff was not significantly limited in a number of work related areas, and was only moderately limited in her ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods of time; work in coordination with others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace; interact appropriately with the general public and co-workers; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others (AR 249). Dr. Melcher concluded that Plaintiff retained the ability to manage the mental demands of many types of jobs not requiring complicated tasks, and was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her mental impairments (AR 250). In rendering her opinion, Dr. Melcher assigned "great weight" and "adopted" Dr. Uran's assessment, finding that Dr. Uran's assessment of Plaintiff's functional abilities was supported by the medical and non-medical evidence in the file (AR 250).

7

On November 26, 2007, Annette Jadus, M.A., from Action Review Group, Inc., prepared a "Vocational Report" (AR 193-196). One of the documents attached to that report was drafted by Ronald Refice, Ph.D. and was styled a "Medical Review Team Disability Certification" (AR 199). Dr. Refice concluded that Plaintiff's mental impairments met the requirements of Listings 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders) (AR 194; 196). Specifically, Dr. Refice found that Plaintiff had marked difficulties in maintaining social functioning, maintaining concentration, and persistence and pace (AR 196; 199). He further provided an explanation which highlighted the various clinical findings supporting his conclusion that she met the previously described Listings (AR 199).

Ms. Jadus also rendered an opinion relative to the Plaintiff's residual functional capacity, stating:

> It is evident from the documentation in this record that Ms. Hutton is an individual with extensive non-exertional and exertional limitations, currently precluding her from functioning independently, appropriately, effectively, or on a sustained basis. If she were to secure employment at this time, she would be unable to get through a normal work day or work week without interruptions from both psychiatrically and physically based symptoms. As a result of her severe and prolonged periods of depression notable for extremely low mood, poor concentration, chronic sadness, anhedonia, and fatigue and lack of energy, Ms. Hutton would have difficulties attending to a task from start to finish, or maintaining pace and persistence at any job. Her anxiety, Post Traumatic Stress Disorder symptoms, social withdrawal and isolation, and loss of interest would also contribute to inevitable difficulties interacting appropriately and consistently with supervisors, co-workers, or the public. Ms. Hutton is an individual who would decompensate under even minimal stressors in any job setting. She would have difficulty working under pressure, tolerating change, or coping with even minor stressors without decompensating.

(AR 196). Ms. Jadus concluded that Plaintiff was unable to perform her past work as a cashier, as well as any other substantial gainful activity (AR 196).

On April 9, 2009, Sherry Addicott, Psy.D., psychologically evaluated Plaintiff as a pre-operative requirement for bariatric surgery (AR 410-414). At that time Plaintiff was 5"3" tall and weighed 242 pounds, with a BMI of 42.9 (AR 410). Plaintiff relayed her previous social history, and reported that after the birth of her children she was unable to work (AR 410).

Plaintiff reported that she enjoyed reading and scrapbooking in her spare time (AR 410). She claimed she had no difficulty with her weight until she had four pregnancies in four years (AR 411). She reported her attempts to lose weight and exercise (AR 411). Plaintiff stated that she had received psychiatric treatment and counseling in the past, but since the death of her daughter in 2006 she developed a fear of doctors (AR 411). Plaintiff claimed that her fear of doctors held her back from pursuing surgery and she had an "extreme distrust" of doctors (AR 412). She reported that she had not taken any psychotropic medications since 2007 (AR 411). Plaintiff indicated that she suffered from mood swings, sleep difficulties, variable appetite, lack of energy and decreased interest (AR 411). She reported difficulty interacting with others, but also reported she was uncomfortable and unhappy when alone (AR 411).

On mental status examination, Plaintiff was polite, and cooperative and appeared to respond in an open and honest manner (AR 412). Dr. Addicott reported that her mood and affect were somewhat dysthymic and she had a significant number of depressive symptoms, but she denied any past and present suicidal ideations (AR 412). Her thought processes were clear, logical, and goal directed with no indication of delusions, hallucinations, or paranoid thought processes (AR 412). She had no difficulty with memory or concentration (AR 412). Dr. Addicott found that her insight into the connection between her mood and weight was poor (AR 412). Dr. Addicott diagnosed Plaintiff with an eating disorder, not otherwise specified; bipolar disorder, unspecified (by report); and PTSD (by report), and assessed her with a GAF score of 65 (AR 413). Dr. Addicott recommended that Plaintiff return to counseling and seek psychiatric evaluation (AR 413). She noted that Plaintiff continued to suffer from the effects of previous abuse and needed to develop stronger, more appropriate coping skills and insight before undergoing surgery (AR 413).

Plaintiff and Paula Day, a vocational expert, testified at the hearing held by the ALJ on May 28, 2009 (AR 58-85). Plaintiff testified that she last worked in 2005 but quit her job as a factory worker due to the stress of a recent miscarriage and an argument with her husband (AR 63). Plaintiff stated that she also worked as a cashier at Sheetz, but quit that job after an argument with a new manager (AR 70). Plaintiff testified that she had suffered from depression

9

since she was twelve years old (AR 64). She claimed that approximately two days per week she was unable to get out of bed (AR 64-65; 73). Plaintiff indicated that she did not have "happy days," but had some "consistent days" where she was "calm and mellow" (AR 73). Plaintiff claimed she was unable to work because of an inability to "handle the pressure" (AR 67). She stated she became agitated and "little thing[s]" would "set [her] off" (AR 67). She stated that she found it stressful being around other people (AR 71; 74). Plaintiff indicated that she was violent when angry and upset, and had previously broken her husband's nose during a fight (AR 71-72). Plaintiff also stated that she had problems being alone (AR 71).

Plaintiff testified that she was 5"3" tall and weighed 245 pounds (AR 63). She suffered from hypertension and was on medication, but at times it was uncontrolled (AR 63-64; 74). On days when her blood pressure was uncontrolled, Plaintiff testified that she felt faint, became aggravated and felt under pressure (AR 74). She also suffered from swelling in her ankles, knees and hands, but stated that medication helped alleviate the swelling (AR 64). She was able to perform housework, but her husband handled the majority of the household chores (AR 65). She engaged in scrapbooking with her children and helped them with their homework (AR 65-66). She shopped for groceries every two weeks with her husband, but at times had to leave the store due to an inability to be around crowds (AR 69).

Plaintiff testified that she was not taking any medication at the time of the hearing, but was looking for a therapist (AR 67). She claimed she had trouble finding a therapist that would accept her insurance (AR 72). Plaintiff also testified that she had difficulty with the medical profession since the death of her daughter in 2006 (AR 75-76).

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was limited to light work involving simple, repetitive job tasks without frequent interaction with the general public (AR 81-82). The vocational expert testified that such an individual could perform the jobs of a laundry folder, mail clerk and garment press operator (AR 82). The vocational expert further testified that such an individual would not be able to sustain employment if she were absent more than two days per month and were off task for one half hour on any given shift (AR 82).

Following the hearing, the ALJ issued a written decision finding Plaintiff was not entitled to a period of disability, DIB or SSI within the meaning of the Act (AR 11-23). Her request for review by the Appeals Council was denied rendering the ALJ's decision the final decision of the Commissioner (AR 1-4). She subsequently filed this action.

### III. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 1097, 229 (1938)); *see also Richardson v. Parales*, 402 U.S. 389, 401 (1971); *Ventura v. Shalala*, 55 F.3d 900, 901 (3rd Cir. 1995). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson*, 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3rd Cir. 1995). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3rd Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

### IV. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). In order to be entitled to DIB under Title II, a claimant must additionally establish that her disability

11

existed before the expiration of her insured status. 42 U.S.C. § 423(a), (c); *Matullo v. Bowen*, 926 F.2d 240, 244 (3rd Cir. 1990) (claimant is required to establish that he became disabled prior to expiration of his insured status); *see also* 20 C.F.R. § 404.131. The ALJ found that Plaintiff met the disability insured status requirements of the Act through March 31, 2004 (AR 11). Therefore, Plaintiff must show that she was disabled on or prior to that date for purposes of entitlement to disability insurance. Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) *with* 42 U.S.C. § 1382(a). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen*, 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id*. If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. The ALJ concluded that Plaintiff had not engaged in substantial gainful activity (AR 14). The ALJ further found that her obesity, hypertension, depression, anxiety, PTSD and edema were severe impairments, but determined at step three that she did not

12

meet a Listing (AR 14-16). The ALJ found that she was able to perform light work, except that she was limited to the performance of simple, repetitive tasks, without frequent interaction with the general public (AR 16-17). At the final step, the ALJ concluded that she could perform the jobs cited by the vocational expert at the administrative hearing (AR 22). In addition, the ALJ concluded that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent they were inconsistent with his residual functional capacity assessment (AR 17-18). Again, I must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Step three requires a determination of whether the claimant has an impairment or combination of impairments which meets or equals a listed impairment in Appendix 1, 20 C.F.R. § 416.920(d). The Listing of Impairments describes impairments which preclude an adult from engaging in substantial gainful activity without regard to his or her age, education or work experience. *Knepp v. Apfel*, 204 F.3d 78, 85 (3rd Cir. 2000). A claimant who meets or medically equals all of the criteria of an impairment listed in Appendix 1 is *per se* disabled and no further analysis is necessary. *Burnett v. Comm'r*, 220 F.3d 112, 119 (3rd Cir. 2000). The burden is on the claimant to present evidence in support of his or her allegation of *per se* disability. *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3rd Cir. 1992).

Plaintiff argues that her alleged mental impairments met Listing 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders). *See* [ECF No. 7] Plaintiff's Brief pp. 9-14. Both of these Listings consist of a paragraph A criteria (a set of medical findings), and a paragraph B criteria (a set of impairment-related functional limitations). 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04; 12.06. In each Listing, paragraph B criteria requires at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence or pace; or
4. Repeated episodes of decompensation, each of extended duration[.]

13

20 C.F.R. Pt. 404, Subpt. P, App. 1 s 12.04(B); 12.06(b). The term "marked" means "more than moderate but less than extreme," and a "marked limitation" is one that seriously interferes with a claimant's ability to "function independently, appropriately, effectively, and on a sustained basis." 20. C.F.R. Pt. 404, Subpt. P, Appx. 1 12.01C. Here, the ALJ found that the Plaintiff's mental impairments did not meet part B because the evidence reflected only mild limitations of activities of daily living, moderate difficulties in maintaining social functioning, concentration persistence or pace, and there had never been an episode of decompensation (AR 16).

Step four requires a determination of the claimant's residual functional capacity ("RFC"), which is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc.Sec. Admin.,* 220 F.3d 112, 121 (3rd Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3rd Cir. 1999). The ALJ concluded that Plaintiff had the RFC to perform light work, except that she was limited to the performance of simple, repetitive tasks, without frequent interaction with the general public (AR 16-17). Plaintiff argues that a more restrictive RFC was warranted based upon the medical evidence of record. *See* [ECF No. 7] Plaintiff's Brief pp. 18-19.

Plaintiff contends that the ALJ erred in his evaluation of the evidence based, in part, on her contention that the ALJ failed to address the reports of Dr. Refice and Ms. Jadus. As the finder of fact, the ALJ is required to review, properly consider and weigh all of the medical records provided concerning the claimant's claims of disability. *Fargnoli v. Massaneri,* 247 F.3d 34, 42 (3rd Cir. 2001) (citing *Dobrowolsky v. Califano*, 606 F.2d 403, 406-07 (3rd Cir. 1979)). When the medical evidence of record conflicts, "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" *Plummer v. Apfel*, 186 F.3d 422, 428 (3rd Cir. 1999) (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3rd Cir. 1993)). The ALJ must give some indication of the evidence he rejects and his reasons for discounting such evidence. *Plummer,* 186 F.3d at 429. "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705 (3rd Cir. 1981). Similar to medical reports, the ALJ must also

14

consider and weigh all of the non-medical evidence before him. *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3rd Cir. 1983); *Cotter,* 642 F.2d at 707.

Here, a review of the ALJ's decision reveals that he failed to mention, much less discuss, the reports of Dr. Refice and Ms. Jadus. The Commissioner argues that the ALJ did not err in failing to address those reports based on his contention that a determination made by a non-governmental agency or any other governmental agency is not binding on the Commissioner, citing 20 C.F.R. §§ 404.1504 and 416.904. *See* [ECF No. 10] Defendant's Brief p. 11 n.5. The issue, however, is not whether the reports were binding on the ALJ. They clearly were not. Rather, the issue is simply whether the ALJ erred in failing to address material evidence supportive of the Plaintiff's claim in violation of *Cotter* and its progeny. I find on this record that the ALJ did err in this regard. Consequently, this matter will be remanded to the ALJ with the direction that he address this evidence consistent with the dictates of the previously described case law.

Finally, Plaintiff argues that the hypothetical posed to the vocational expert did not accurately portray her limitations resulting from her impairments and therefore, the vocational expert's response to the hypothetical does not constitute substantial evidence supporting the ALJ's decision to deny benefits. Given the Court's remand, it is unnecessary to reach this argument, inasmuch as the ALJ will necessarily reconsider the Plaintiff's functional limitations following his consideration of the reports of Dr. Refice and Ms. Jadus.

## V. CONCLUSION

For the reasons discussed above, the Defendant's motion for summary judgment will be denied and the Plaintiff's motion for summary judgment will be granted only to the extent she seeks a remand for further consideration.[3] The matter will be remanded to the Commissioner for further proceedings. An appropriate Order follows.

---

[3] The ALJ is directed to reopen the record and allow the parties to be heard via submissions or otherwise as to the issue addressed in this Memorandum Opinion. *See Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 800-01 (3rd Cir. 2010).

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMANDA SUE HUTTON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 10-211 Erie |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

AND NOW, this 29th day of September, 2011, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Defendant's Motion for Summary Judgment [ECF No. 9] is DENIED, and the Plaintiff's Motion for Summary Judgment [ECF No. 6] is GRANTED only to the extent she seeks a remand for further consideration by the Commissioner. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is directed to mark the case closed.

                                                    s/ Sean J. McLaughlin
                                                      United States District Judge

cm:    All parties of record